**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHAWN UNDERWOOD,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:11-CV-171** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **FRANK WASKO, et al.,** | : | |
| | : | **Magistrate Judge Mark R. Abel** |
| **Defendants.** | : | |

<u>**OPINION AND ORDER**</u>

**I. INTRODUCTION**

This matter is before the Court on cross-motions for partial summary judgment.  Plaintiff Shawn Underwood ("Plaintiff" or "Underwood") alleges the following claims pursuant to 42 U.S.C. § 1983 in his first amended complaint: violation of his First Amendment right to free speech (Count I); false arrest in violation of his Fourth Amendment rights (Count II); malicious prosecution in violation of his Fourth Amendment rights (Count III); excessive force (Count IV); and municipal liability (or a *Monell* claim) (Count V).  (Doc. 13.)  Underwood moves for partial summary judgment on Counts I and II, (Doc. 18), and Defendants Franko Wasko and City of Columbus (collectively referred to as "Defendants") move for partial summary judgment on Counts I, II, III, and V, (Doc. 21).  Underwood's claim for excessive force is not at issue in this opinion and order.

For the following reasons, Plaintiff's motion for partial summary judgment is **DENIED** and Defendants' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part.

## II. BACKGROUND

### A. Factual History

On April 8, 2010 around 10:45 p.m., detectives from the Columbus Division of Police ("CPD") Vice Unit were conducting an undercover operation related to the sale of liquor to minors at the Thirsty Whale, a bar located at 2081 Eakin Road in Columbus, Ohio.  The detectives involved in the operation included Frank Wasko, Jeffrey Tabor, Mark Young, Gregory Murphy, Robert Cutshall, and Sergeant Michael Wilson.  According to Wasko's affidavit, the CPD had received complaints about the Thirsty Whale and had been sent to the bar on previous occasions for incidents involving gangs, guns, and fights.

When the CPD arrived at the Thirsty Whale, an underage confidential informant accompanied by a detective was sent into the bar.  The bartender sold an alcoholic beverage to the underage informant, the informant obtained a sample of the alcoholic beverage for evidentiary purpose, and the informant and detective walked out of the bar.  Wasko and Tabor entered the bar next, went behind the bar to issue a citation to the bartender for the underage sale, and identified themselves as police officers.  According to affidavits by detectives Wasko and Tabor, there were 20–25 people in the bar.  (Doc. 21 at 3) (citing Doc. 22 ¶ 9; Doc. 21-2 ¶ 7.) Plaintiff, relying on his own affidavit testimony and the affidavit testimony of Samantha Meadows, a female who was with Underwood the night of his arrest at the Thirsty Whale, asserts that there were no more than 15 people in the bar.  (Doc. at 24 at 3) (citing Doc. 24-1 ¶ 7; Doc. 24-2 ¶ 13.)

The parties disagree about what happened next.  According to the Defendants, while Wasko and Tabor were speaking with the bartender to obtain information for the citation, Underwood started yelling "fuck the police," "fuck you," "what can they do?," "there are only

two of them."  Defendants contend that while Underwood was yelling, he was simultaneously pointing at the officers and walking toward the bar where they were standing.  Underwood was also gesturing with his arms in an attempt to get the other bar patrons riled-up, and his conduct caused some of the patrons to start yelling "fuck the police" and moving toward the bar.  Wasko ordered Underwood to be quiet, but he refused and continued to yell obscenities at the officers.  When Wasko advised Underwood that he was under arrest, he quickly ran out of the bar.  Wasko ran after Underwood and arrested him in the parking lot.  Underwood was charged with obstructing official business in violations of Columbus City Code 2321.31[1] and riot in violation of Columbus City Code 2317.03(A)(2).[2]  (Doc. 21 at 3–4) (citing Doc. 22 ¶¶ 10–16; Doc. 21-2 ¶¶ 8–11.)

Underwood presents affidavit evidence when opposing Defendants' motion for partial summary judgment that contradicts Defendants' affidavit evidence.  Underwood contends that after spending a few minutes at the bar, plainclothes officers announced that they were closing the Thirsty Whale.  Underwood and other patrons began heading toward the door to leave.  As he was exiting the bar, Underwood threw up his hands and yelled, "fuck the police."  Meadows

---

[1] Columbus City Code 2321.31, entitled "Obstructing official business," states:

> (A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties.

> (B) Whoever violates this section is guilty of obstructing official business, a misdemeanor of the second degree.

[2] Columbus City Code 2317.03, entitled "Riot," states, in pertinent part:

> (A) No person shall participate with four (4) or more others in a course of disorderly conduct in violation of Section 2317.11 [Disorderly conduct] the Columbus City Codes:

> . . . .

>> (2) With purpose to intimidate a public official or employee into taking or refraining from official action, or with purpose to hinder, impede, or obstruct a function of government . . . .

asserts in her affidavit that no other patron began chanting, joining Underwood's sentiment, or threatening the police.  Underwood walked out to the parking lot, got into his minivan, started it, and shifted into reverse.

Wasko followed Underwood out of the bar and confronted him in his car with gun drawn and aimed.  Underwood contends Wasko's hands were shaking with fury.  Once Underwood put the minivan into park, Wasko opened the door and drug Underwood out of the minivan.  Wasko swung Underwood around, threw him on the ground, and jumped on top of him, pinning Underwood to the pavement with his knee.  Underwood shouted, "I'm not resisting!," but Wasko placed the muzzle of his gun against the backside of Underwood's head and stated, "I could blow your fucking brains out and no one would give a shit about it."  (Doc. 24 at 3–4) (citing Doc. 24-1 ¶¶ 9–20; Doc. 24-2 ¶¶ 5–17.)

Underwood also submitted a radio recording in which Sergeant Wilson requests patrol cars at the Thirsty Whale.  The dispatcher asks Wilson: "What is going on?  Fight or anything?  Or . . .?"  Wilson replies: "Well, we got . . . We . . . Partners in the bar and we got a couple running their mouths but they're startin' to leave."  (Doc. 18.)

The criminal complaint charging Underwood with obstructing official business in violations of Columbus City Code 2321.31 reads in pertinent part:

> [Underwood] did: without privilege to do so and with purpose to obstruct and delay the performance by a public official to wit: Det. Wasko and Det. Tabor of an authorized act which was within the public officials capacity to wit: issue citation for underage sale of alcohol hamper and impede the public official in the performance of the public official's lawful duties, to wit: began yelling and pointing "fuck you," "fuck the police," and began involving approximately 25 people.

(Doc. 13-3.)  The criminal complaint charging Underwood with riot in violation of Columbus City Code 2317.03(A)(2) states in pertinent part:

> [Underwood] did: participate with four or more others in a course of disorderly conduct in violation of section 2917.11, to wit: a bar with approx. 25 people who began yelling "fuck the police" and became agitated after Mr. Underwood began yelling "fuck the police," "fuck you," stood up and started pointing at officers with the purpose to hinder, impede, and obstruct a function of government, to wit: issue citation for sale of alcohol to underage person.

(Doc. 13-2.)  Finally, the arrest information reads:

> On April 8th at 10:48P the "B" company vice unit was working a covert assignment and was dealing with <u>The Thirst Whale</u> for several complaints.  Det. Cutshall sent his CI into the bar with city funds in an attempt to purchase alcohol while being under age.  The bartender did sell to the CI and while the detectives were attempting to arrest the bartender, the defendant began yelling "fuck the police" and pointing at the detectives.  The defendant continued his yelling and got some of the other patrons to start yelling "fuck the police."  The defendant was told to stop and he yelled even louder "fuck the police" "what can they do."  Detective Wasko had to center his attention away from the bartender (his major reason for being inside).  After the crowd began yelling, Det. Wasko told the defendant to come here that he was under arrest but he took off running, jumping into his vehicle and attempting to get away but was caught by Det. Wasko.  The Defendant was charged with cited offenses and slated.

(Doc. 13-1) (emphasis in original.)  The charges against Underwood were dismissed when Wasko was unavailable to testify.

## B. Procedural History

Underwood brought suit against Wasko, the CPD, and the City of Columbus on February 24, 2011.  (Doc. 2.)  The CPD moved for judgment on the pleadings, arguing that it was not *sui juris*, and this Court granted that motion.  (Doc. 8, 10.)  Underwood filed his first amended complaint against Wasko and the City of Columbus thereafter, discussed *infra* Part I.  (Doc. 13.)  Underwood's motion for partial summary judgment on Counts I and II was filed on January 17, 2012, (Doc. 18), and the Defendants' cross-motion on Counts I, II, III, and V was filed on February, 15, 2012, (Doc. 21).  This Court held a hearing where both parties had the opportunity to be heard.  The cross-motions for partial summary judgment are now ripe for review.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant, therefore, has the initial burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388−89 (6th Cir. 1993).  The central inquiry is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251−52.  If the moving party meets its burden, then the non-moving party is under an affirmative duty to point out specific facts in the record, which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-moving party may not rest merely on allegations or denials in its own pleadings, *see Celotex*, 477 U.S. at 324, but must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts," *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

"[A]t the summary judgment stage the judge's function is not himself to weigh evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Moreover, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim.  *InterRoyal Corp. v.*

*Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  Instead, the court may rely on the evidence called to its attention by the parties.  *Id.*

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1999).  The Court "must evaluate each party's motion on its own merits" and may not grant "summary judgment in favor of either party . . . if disputes remain as to material facts."  *Id.*

### IV. LAW AND ANALYSIS

This Court must resolve one threshold matter prior to analyzing the applicable law in this case.  In his motion for partial summary judgment, Underwood states that "for the purpose of demonstrating that under either party's account, Mr. Underwood is entitled to summary judgment, Mr. Underwood confines his recitation of the facts to those facts which are found in the records authored and recorded by Defendants."  (Doc. 18 at 1–2.)  These records include the criminal complaints charging Underwood and the arrest information.  The complaints and arrest information generally support Defendants' account of the facts in this case, but, Defendants present affidavit evidence in their opposition to Underwood's motion for partial summary judgment that provides additional detail about the incident at the Thirsty Whale.

When opposing Defendants' motion for partial summary judgment, however, Underwood presents his own affidavit evidence that contradicts the facts in the criminal complaints and the arrest information.  For example, the affidavits presented by Underwood indicate that he shouted "fuck the police" as he was walking out the door of the Thirsty Whale.  (Doc. 24-1 ¶ 9–10; Doc. 24-2 ¶ 14.)  Meadows states in her affidavit that "[n]o civilian in the bar appeared affected by this statement" and "[n]o one chanted, joined the sentiment, or threatened the police."  (Doc. 24-

2 ¶ 15.)  In his opposition to Defendants' motion for partial summary judgment, Underwood argues that because "[c]ross motions for summary judgment are to be considered separately," he is under no obligation with respect Defendants' motion to accept the facts in the criminal complaints and Arrest Information as true, although he is willing to do so for purposes of his motion for partial summary judgment.  (Doc. 24 at 2) (citing *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 950 (6th Cir. 2009)).

Underwood cannot have it both ways, and his assertion that he is willing to accept Defendant's facts for the purpose of his own motion for partial summary judgment is disingenuous as he is picking and choosing the facts he accepts.  This Court must consider the record as a whole.  *See Matsushita Elec. Indus.*, 475 U.S. at 350 (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)) (considering the record as a whole when determining if there is a genuine issue for trial).  The Court will not take notice of portions of the record to decide Defendants' motion and ignore those same parts to decide Underwood's motion.  Furthermore, the *Ferro Corp.* case cited by Underwood to support his position, does not do so; rather, it stands merely for the propositions that "[t]he standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation" and that "the court must evaluate each party's motion on its own merits." 585 F.3d at 950 (citing *Taft Broad Co.*, 929 F.2d at 248).  This Court will, indeed, examine each party's motion on its own merits, but when doing so, it will consider the record in its entirety.

Now, turning to the relevant legal analysis: to state a claim under § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting *Sigley v.*

*City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).  Section § 1983 "'is not itself a source of substantive rights' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).

There is no dispute that Wasko was acting under the color of state law on the night of Underwood's arrest.  The dispute is as to whether Underwood was deprived of his constitutional rights.

### A. First Amendment Free Speech Claim (Count I)

Both parties have moved for summary judgment on Count I in Underwood's first amended complaint for violation of his First Amendment right to free speech.

Generally, "[t]here can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment."  *McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 520 (6th Cir. 2001).  "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987).

Certain "fighting words," or words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace," however, are not protected by the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942).  Fighting words are those that are likely to "cause an average person to react thus causing a breach of the peace."  *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (citing *Chaplinsky*, 315 U.S. 574).  An onlooker would consider the words a "direct personal insult or an invitation to exchange fisticuffs."  *Texas v. Johnson*, 491 U.S. 397, 409 (1989).  Nevertheless, this exception is "very limited because it is

9

inconsistent with the general principle of free speech recognized in our First Amendment jurisprudence." *Sandul*, 119 F.3d at 1255; *see Johnson*, 491 U.S. at 408–09 (citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) ("[A] principal 'function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'")).

Moreover, "[a]bsent a more particularized and compelling reason for its actions, [a] State may not, consistently with the First and Fourteenth Amendments, make the simple public display . . . of [a] four-letter expletive a criminal offense." *Cohen v. California*, 403 U.S. 15, 26 (1971).  In *Cohen*, for example, the Supreme Court held that convicting a defendant who walked through a courthouse corridor wearing a jacket bearing the words "Fuck the Draft" was unconstitutional under the First and Fourteenth Amendments.  *Id.* at 16–17, 26.

Underwood relies on *Brown v. City of Warren* to argue he was engaging in free, protected speech.  4:05-cv-2439, 2007 WL 188360 (N.D. Ohio Jan. 22, 2007).  The *Brown* court held that where a young man yelled "fuck the police" and "you guys ain't shit" in the middle of the street, there was no probable cause for the officers to arrest the man.  *Id.* at *1–2, 10.  There was no evidence that the young man "took any affirmative steps to interfere with the officers' bike patrol duties"; rather, "the officers, on their own volition, broke off their conversation with the Mercer Place resident to pursue [the young man] solely because of the profanities he was shouting." *Id.* at *9.

Defendants argue that Underwood was engaging in more than mere speech because he was pointing at the officers, walking toward them in a threatening manner, and gesturing with his arms to get the other patrons in the Thirty Whale agitated.  Defendants support their position

10

with affidavit testimony that Underwood's behavior was successful in riling up the other bar-goers because they started yelling "fuck the police" and walking toward the officers who were behind the bar talking with the bartenders.  Defendants point out that there is case law explaining that although citizens must be given "considerable latitude . . . to express their views about the police and their activities," if "speech transforms into verbal conduct, then this *conduct* can constitutionally be criminalized."  *Patrizi v. Huff*, 821 F.Supp.2d 926, 932–33 (N.D. Ohio 2011) (citing *Kaylor v. Rankin*, 356 F.Supp.2d 839, 847 (N.D. Ohio 2005)).  When a person continues to interfere with a police officer's investigation and questioning of a third person, such verbal conduct is not entitled to First Amendment protection.  *King v. Ambs*, 519 F.3d 607, 611 (6th Cir. 2008).  Underwood's behavior, Defendants' argue, amounted to verbal conduct that can constitutionally be criminalized.

Both parties overlook additional instructive Circuit precedent.  In *Sandul*, the defendant, who was riding passenger-side in a moving truck, leaned out of the vehicle as it passed abortion protesters and shouted "fuck you" while extending his middle finger at the group.  119 F.3d at 1252.  An officer who was talking with the protestors observed the defendant's conduct, and, believing that it violated the city's disorderly conduct ordinance, began pursuing the truck until it stopped in front of the defendant's home.  *Id.*  The defendant was arrested and charged with disorderly conduct and felonious assault.  *Id.*

The *Sandul* court held that the defendant's words did not rise to the level of fighting words and his "actions were not likely to inflict injury or to incite an immediate breach of the peace."  *Id.* at 1255.  The court noted that the truck in which defendant was moving and traveling was on the opposite side of the street from the protest.  *Id.*  The incident was over in a matter of seconds.  *Id.*  Moreover, there was "no face-to-face contact between Sandul and the protesters,"

making it "inconceivable that Sandul's fleeting actions and words would provoke the type of lawless action alluded to in *Chaplinsky*." *Id.*; *see also Greene v. Barber*, 310 F.3d 889, 895–98 (6th Cir. 2002) (finding that defendant's characterization of a police officer as an "asshole" was insufficient to trigger the "fighting words" exception to the First Amendment); *Perkins v. City of Gahanna*, No. C2-99-533, 2000 WL 1459444, at *2–3 (S.D. Ohio Sept. 21, 2000) (Sargus, J.) (granting plaintiff's motion for summary judgment on his § 1983 claims where he was arrested for telling an officer to "have a nice day" and pointing his middle finger at him as he was exiting the police station).

When taken in a light most favorable to the non-moving party on each respective motion, as this Court must, summary judgment cannot be granted in favor of either party without improperly weighing the evidence. *See Anderson*, 477 U.S. at 249.  If the Court were to adopt Defendants' version of the facts, this case is more analogous to *King*.  Defendants have presented evidence that Underwood not only yelled "fuck the police," but also "what can they do?" and "there are only two of them."  While Underwood was yelling these profanities, according to Defendants' affidavit evidence, he was also walking toward the bar and getting other bar patrons riled up.  Some even also began yelling "fuck the police."  These facts tend to indicate that Underwood, like the defendant in *King*, was interfering with the officer's questioning of a third party (here, the bartender), and consequently, his verbal conduct would not be entitled to First Amendment protection.  519 F.3d at 611; *see also Brown v. Fick*, No. 10–11330, 2011 WL 589210, at *1–3, 5–6 (E.D. Mich. Feb. 10, 2011) (granting defendants' motion for partial summary judgment on plaintiff's fourth amendment claim that she was arrested without probable cause because plaintiff was arrested after interrupting officers who were trying to arrest her daughter who had fled from the officers).

12

If this Court were to adopt Underwood's version of the facts, however, this case would be more analogous to *Brown* and *Sandul*.  According to Underwood's affidavit evidence, he shouted "fuck the police" and threw his hands up *as he exited the bar*.  Meadows's affidavit indicates no other patron began chanting, joining his sentiment, or threatening the police.  Underwood's conduct in this scenario is akin to the conduct of the defendant in *Brown* who shouted "fuck the police" in the middle of the street, or the defendant in *Sandul* who yelled and gestured at the abortion protesters while sitting in the passenger side of a moving vehicle.  None of these incidents would tend to "incite an immediate breach of the peace" because the person yelling the offensive phrase was removed from or leaving an area where he was likely to incite a breach of the peace.  *Chaplinsky*, 315 U.S. at 571−72.  Merely "induc[ing] condition of unrest" or "stir[ing] people to anger" is not enough to remove speech from the protective shield of the First Amendment.  *See Johnson*, 491 U.S. at 408–09.  Moreover, Wasko followed Underwood out of the bar into the parking lot, but the other officer remained inside and finished giving the bartender a citation.  In fact, Wasko was the only officer who ran after Underwood.  Perhaps most importantly, the fact that Underwood was in his minivan in the parking lot when arrested him, lends strong support Underwood's position that he was not engaged in any verbal conduct synonymous to the verbal conduct in *King*.

Underwood's motion for partial summary judgment with respect to Count I is **DENIED**, as is Defendants' cross-motion for partial summary judgment on Count I.

*B. False Arrest (Count II)*

Both parties also move for summary judgment on Count II in Underwood's first amended complaint for false arrest.

In the context of a § 1983 action, "[a] false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). "An officer has probable cause when 'the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). An officer's actions are measured by what a reasonable officer would have done under the same circumstances. *Sandul*, 119 F.3d at 1256. In a civil case, the plaintiff has the burden of proving an absence of probable cause. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

Plaintiff argues that neither he nor anyone else in the bar did "anything physically menacing to the police, advocated violence, or attempted, by any means, to impede the arrest of the bartender." (Doc. 18 at 9.) Underwood contends he was merely verbally criticizing the officers, which is conduct that does not amount to probable cause. Defendants rebut that there was probable cause that Underwood had violated Columbus City Code 2321.31 and 2317.03(A)(2) because "Plaintiff's conduct hampered and impeded Officer Wasko's performance of his official law enforcement duties of investigating and issuing a citation to the bartender because his attention was drawn from the bartender to Plaintiff and, even after being ordered to be quiet, Plaintiff persisted with his behavior." (Doc. 21 at 9.)

The Court runs into the same conundrum here as it did with Underwood's First Amendment claim: summary judgment cannot be granted because there are genuine disputes of material fact. If this Court were to adopt Underwood's version of the facts, probable cause would have been lacking as Underwood was merely yelling and demonstrating frustrating by

14

throwing his hands up as he exited the Thirsty Whale.  Yet, if this Court were to adopt

Defendants' version of the facts, then there would be probable cause for Underwood's arrest

because, by yelling and pointing at the officers, Underwood was attempting to "prevent, obstruct,

or delay the performance by a public official . . . in the performance of his lawful duties."  *See*

Columbus City Code 2321.31.  His verbal conduct could have interfered with the officers'

questioning of the bartender.  *See King*, 519 F.3d at 611.

Because neither party has sustained its burden for purposes of summary judgment,

Underwood's motion for partial summary judgment on Count II is **DENIED**, as is Defendants'

motion for partial summary judgment on the same Count.

### C. Malicious Prosecution (Count III)

Defendants move for summary judgment on Plaintiff's claim for malicious prosecution.

The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious

prosecution under the Fourth Amendment," which "encompasses wrongful investigation,

prosecution, conviction, and incarceration."  *Barnes v. Wright*, 449 F.3d 709, 715–16 (2006).  In

*Skyes v. Anderson*, this Circuit articulated the elements of a §1983 malicious prosecution claim

for the first time.  625 F.3d 294, 308 (6th Cir. 2010).  To succeed on a malicious prosecution

claim, a plaintiff must prove: (1) "that a criminal prosecution was initiated against the plaintiff

and that the defendant made, influenced, or participated in the decision to prosecute"; (2) that

there was "a lack of probable cause for the criminal prosecution"; (3) that "as a consequence of a

legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure"; and

(4) the criminal case must have been resolved in plaintiff's favor.  *Id.* at 308–09.

Defendants rely on the same arguments they made with respect to Count II and argue that

Underwood cannot prove the second element of his malicious prosecution claim because there

was probable cause for Officer Wasko to arrest Underwood.  Defendants also attack the first element of Plaintiff's malicious prosecution claim arguing that "there is no evidence that Officer Wasko did anything related to Plaintiff's criminal prosecution other than sign the criminal complaints."  (Doc. 21 at 11.)  Plaintiff rebuts that his prosecution was without probable cause, and that Wasko influenced and participated in the prosecution, as well as "was the initiatory of the prosecution and  the prime moving force behind it."  (Doc. 24 at 17.)  Underwood points to the facts that Wasko was the only officer who went after Underwood, pointed his gun at Underwood, threw Underwood on the ground, authored the criminal complaints against Underwood, was listed as an "officer complaintant," and caused the trial to be continued and ultimately dismissed because he did not show up.  (*Id.*)

When the evidence is viewed in a light most favorable to the Underwood, it is evident that a "reasonable jury could return a verdict for" Underwood on his malicious prosecution claim.  *See Anderson*, 477 U.S. at 248.  Defendants have failed to sustain their burden of establishing that no genuine issue of material fact exists with respect to probable cause, as explained *infra* Part IV.B.  With respect to the first element of Plaintiff's malicious prosecution claim, admittedly, "[t]here is very little case law in this circuit discussing precisely what role an investigating officer must play in initiating a prosecution such that liability for malicious prosecution is warranted."  *Anderson*, 477 U.S. at 311.  Nevertheless, case law does "indicate that an officer may be responsible for commencing a criminal proceeding against a plaintiff where the officer made, influenced, or participated in the decision to prosecute."  *Id.* (internal quotations omitted) (citing *Fox v. DeSoto*, 489 F.3d 227,  237 (6th Cir. 2007)).  Therefore, just because an officer did not make the decision to prosecute dose not "per se absolve" the officer from liability.  *Id.*  "Whether an officer influenced or participated in the decision to prosecute

16

hinges on the degree of the officer's involvement and the nature of the officer's actions. . . . The totality of the circumstances informs this factual determination." *Id.* at 312 n.9 (citing *Malley v. Briggs*, 475 U.S. 335, 344–45 n.7 (1986)).

Underwood presented evidence from which a reasonable jury could conclude that Wasko influenced or participated in the decision to prosecute Underwood. Wasko was the only officer who arrested Underwood and thereafter issued the criminal complaints against Underwood. A jury could determine that Wasko's account of the facts in the criminal complaint, given their contradictory nature to the facts in the affidavits presented by Underwood, stated "deliberate falsehood or showed reckless disregard for the truth," and that the allegedly false or omitted information was material to the finding of probable cause. *Anderson*, 477 U.S. at 312 (citing *Molnar v. Care House*, 359 F. App'x 623, 627 (6th Cir. 2009)) (explaining that "in order to establish that a testifying officer was responsible for commencing a criminal proceeding for purposes of a malicious-prosecution claim, the Plaintiffs were required to present evidence that [the officer] '(1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that he allegedly false or omitted information was material to the [court's] finding of probable cause."). Consequently, Defendants have failed to meet their burden of establishing that there is no genuine issue of material fact with respect to Underwood's malicious prosecution claim.

Defendants' motion for partial summary judgment with respect to Count III is **DENIED**.

### D. Municipal Liability/Monell *Claim (Count V)*

Defendants move for summary judgment on Plaintiff's claim for municipal liability in Count V.

In *Monell v. Department of Social Services*, the Supreme Court held that a municipality may be held liable under § 1983 for the unconstitutional acts of its employees if either a municipality's official policy or one of its customs is the source of injury.  436 U.S. 658, 694 (1978).  A plaintiff must demonstrate that the official policy or custom in question is the "moving force" behind the constitutional violation; the existence of an official policy or custom cannot be demonstrated by the occurrence of the alleged constitutional violation itself.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

In order "to satisfy the *Monell* requirements, a plaintiff must identify the policy [or custom], connect the policy to the [government entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993).  A municipal policy includes "a policy statement, ordinance, regulation, or decision adopted and promulgated." *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 690).

Alleging a single decision by municipal policymakers, such as a legislative act or a decision by an official with final authority, can be sufficient for municipal liability to attach. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84 (1986).  Alleging one specific incident by municipal employees resulting in a deprivation of rights, however, is generally insufficient; rather, a plaintiff must show the deprivation is a result of deliberate indifference or gross negligence on the part of the officials in charge, or conduct explicitly or implicitly authorized by a decision maker.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821–24 (1985).

The City of Columbus argues that "[a]lthough Plaintiff makes vague allegations in the Amended Complaint concerning custom or policy and failure to train, those allegations are merely recitations of case law, and Plaintiff does not identify any evidence pointing to such

custom or policy or failure to train."  (Doc. 21 at 11.) The City argues that as a result, it is entitled to summary judgment on this claim.  Plaintiff rebuts that the City must prove "that it trained Officer Wasko in First Amendment law and the fact that he is not entitled to arrest and prosecute people whose constitutionally protected utterance annoy him."  (Doc. 24 at 19.)

To support of failure to train claim, a plaintiff must prove: (1) the training program was inadequate for the tasks the officers must perform; (2) the inadequacy was the result of deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006).  Underwood has simply presented no evidence to support his claim that the City failed to train Wasko; rather, he simply makes conclusory statements that the City failed to adequately train Wasko.  He identifies no City policy or custom as required under *Monell*.  Consequently, the City's motion for summary judgment with respect to Count V is **GRANTED**.

### E. Qualified Immunity

Defendants also argue Officer Wasko is entitled to qualified immunity.

In civil damage actions arising out of government officials' performance of discretionary functions, officials are generally entitled to qualified immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  To evaluate whether qualified immunity applies this Circuit evaluates whether the official violated a constitutional right and whether the impacted right is "clearly established."  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The order of this inquiry is not mandatory, nor does a court need to reach both steps of the analysis.  *Id.*

The determination as to whether the right was "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Ceighton*, 483 U.S. 635, 640 (1987).

The qualified immunity analysis turns on whether Underwood's First Amendment right was violated. If a jury, weighing the evidence in this case, determines that Underwood's speech and conduct was more analogous to verbal conduct under *King* or "fighting speech" under *Chaplinsky*, Wasko would be entitled to qualified immunity because a reasonable officer would understand that his conduct was not violating a clearly established constitutional right. Alternatively, if a jury decides that Underwood simply screamed "fuck the police" as he excited the bar, Wasko would not be entitled to qualified immunity as a reasonable officer would know that arresting Underwood for exercising his First Amendment right to free speech would violate a clearly established constitutional right. The issue in this case is not whether the right to speech freely is clearly established—for surely, it is—but rather whether Underwood's speech was protected speech under the First Amendment.

Thus, because a genuine issue of material fact exists as to whether Underwood's First Amendment rights have been violated, Defendant Wasko's motion for partial summary judgment on qualified immunity grounds is also **DENIED**.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary is **DENIED**, and Defendants' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part. Specifically, the City of Columbus's motion for partial summary judgment with respect to

Underwood's claim for municipal liability (Count V) is **GRANTED**, and Defendants' motion

with respect to the other claims (Counts I, II, and III) is **DENIED**.


**/s/Algenon L. Marbley_____**
**ALGENON L. MARBLEY**
**United States District Court Judge**


**DATE: September 17, 2012**